May it please the Court. I'm Robert Muse and it's my honor and privilege to represent the plaintiffs' appellants in this important First Amendment case. Now I'd like to reserve three minutes of my time for rebuttal. You'll have to watch your own time, but we'll try. This is a case of viewpoint discrimination, the most egregious form of content discrimination that is prohibited regardless of the nature of the form. The county's rejection of plaintiffs' ads was driven by its animus toward plaintiffs' viewpoint, and that being that the pictures in the ads represent the faces of global terrorism. It is the county's objection to plaintiffs' viewpoint that is the motivating factor for rejecting plaintiffs' ads. Now to begin, there's no dispute... I thought they rejected your ad the first time around because it was inaccurate. Your Honor, their... This panel upheld. Correct, Your Honor. There are two ads at issue here. The ads, which have been referred to in our briefing as AFDI ad number one, it objected, it founds false and misleading, demeaning, disparaging, and disruptive. This court upheld just on the question, the question of false and misleading. So do you still want to run that first ad even though it's inaccurate and you have a substitute ad? In other words, is that issue a live issue? Your Honor, we want to keep that issue a live issue because I think as... Well, I know you want to. That question to you specifically is, do you intend to run, if you can, the first ad even though it is inaccurate and you have a replacement ad? The... My clients intend to run both ads should we ultimately prevail on both of the... on all the claims related to those two ads. And with regard to... just briefly on the false and misleading. As this court knows, we did file a petition for Rita Certiorari and that was denied over the dissent of Justice Thomas, but he made the point that I think is a critical point, that under the law there is no basis for a false and misleading restriction on speech that is political speech. And it's clear through the depositions, we didn't have depositions when this case came up on the plenary injunction, that even the county acknowledges that this is political speech. In fact, in the two bases that this court found that it was false and misleading was one, that the FBI made the offers, and two, that there was... the rewards were up to 25 million for one of those pictured in the ad. Well, even Congressman McDermott wrote his letter to Robert Mueller, the director of the FBI, complaining about this ad. Any reasonable observer would view this ad as being from the FBI. The FBI makes the offers for the awards on their website as well, because they work closely with the Rewards for Justice program. Counsel, let me ask you a question just about your opening sentence. Yes, ma'am. Clearly the main issue here is the First Amendment. There is passing reference to due process and equal protection in the briefs, but those issues are not really developed. Is your claim really just a First Amendment claim at this point? The principle claim is First Amendment viewpoint discrimination. When you say principle, are you still making other claims, and if so, are they adequately briefed for independent analysis? I believe so, Your Honor, because the equal protection claim, particularly when you look at the Supreme Court jurisprudence in this area, the equal protection claims are interrelated with the free speech claims, and oftentimes they rise and fall together. If you look at the one of the cases we cited on the viewpoint discrimination, making the point that Mattel versus Tam is still relevant, is that Wandering Dago's case in the Second Circuit. Let me be sure I understand your answer. Your answer is, yes, you are still making a due process claim. Yes, you are still making an equal protection claim, and yes, you think they're adequately briefed in the opening brief. I do, Your Honor, but I do think that the gravamen, the principle issue, is the viewpoint discrimination, and, you know, as Justice Kennedy said, the Mattel versus Tam, the viewpoint discrimination rationale, in effect, overrides all these other issues because it is the principle issue, but I do think that there is... Well, that certainly is the principle issue for the second ad, because the ground on which the county relied is basically the disparagement ground, which the Supreme Court has said is a viewpoint, which is an interesting concept, but they've said it, so there it is. Right, and I think, you know, one of the disputes between the parties here is whether or not the holding of Mattel versus Tam is controlling in this case, and we believe it is, because viewpoint discrimination is viewpoint discrimination. The Supreme Court said that giving offense is a viewpoint, and the disparaging provision that was at issue in Mattel versus Tam is quite similar to the demeaning and disparaging provision at issue here, and regardless of the forum, obviously, there's dispute over whether the forum is a non-public forum, a limited public forum, certainly not from this court. They've held it's a non-public forum, but the question that it's viewpoint discrimination transcends the forum analysis, and it is sufficient for this court to rule that they violated my client's First Amendment rights by denying the ad as on the basis of viewpoint. All right, counsel, could I interject a question, please? Yes, judge. So I have two differences between your case and the hypothetical I'm going to give you, but I'd like to understand your thinking as to how far this viewpoint principle goes from Mattel, let's say, but in a different context. Let's say a group of neo-Nazis or white supremacists wanted to put banner ads on the metro buses, saying that, in our opinion, the white race is superior to all races of people with dark skin, and the Christian religion is superior to people of other religions like Jews, Muslims, Buddhists, or Hindus, and therefore all white others in our community. Let's say that that seems like a political, though ignorant, you know, extreme statement, but if that were done, would the metro bus have to put that banner up because it's a viewpoint? If the subject matter is such that it's permissible, and because they objected to the viewpoint on that particular subject matter, then yes, they would. Under Mattel v. Tam, that would be viewpoint discrimination. Okay, so if they had a banner like that, and the banner said, we want you to do everything you can that's lawful to exclude people who aren't white Christians from our community and keep them out of positions that are significant, all that would be a viewpoint. The metro would have to run the banner because of the First Amendment. In your view, even though people reading that might be offended to the point where they'd say, well, I'll walk or I'll drive my own car and not take the bus. I think if the subject matter of what the banner was on, say if it was, you know, they're running ads about some law dealing with public accommodation and somebody wanted to oppose the law of public accommodation and express a viewpoint that some would consider to be racist or bigoted, that's a viewpoint, and that'd be viewpoint discrimination. That deals with the disparagement standard, but it doesn't deal with the disruption standard. If in Gould's hypothetical, ridership dropped by 75%, the county couldn't make an economic go of it, or people were in droves complaining and very upset, is it your view that the disruption standard is improper? Not necessarily in this respect, Your Honor. I think the disruption standard can be a form of a case on Bonk, that's an odious form of viewpoint discrimination, but this court has held in CMAQ that the disruption standard can be reviewed properly by the court and can be a basis for restricting speech in this non-public forum. But carrying that over to this particular case, you know, in the CMAQ case, there was objective evidence that the court could rely on to determine that there was, in fact, going to be disruption. In here, you don't have that. In fact, in here, you have the State Department ad, which had the same offending motif, as it were, faces of global terrorism, that ran on their advertising space, on their buses, from June 6th of 2013 to June 25th. And based on the testimony that we see in the record, they had a total of eight to ten complaints out of a ridership of about 400,000. So in that case, when you're just basing the rejection on disruption on the reaction, perceived reaction of somebody to a potential viewpoint, you don't have a basis for that. You have viewpoint discrimination. Now certainly, if you have an issue where there is serious public safety that could be involved, like in your hypothetical judge, I think you could objectively determine that they had a basis for rejecting the ad that could be upheld under these standards. I'm sorry, I thought you were finished. I apologize. Well, I was just going to kind of bring it back again to this particular case, because in CMAQ, this court said, a claimed fear of hostile audience reaction could be used as a mere pretext for suppressing expression because public officials opposed the speaker's point of view. That's exactly this hypothetical, or excuse me, not hypothetical, this particular case, where we don't have any pretext, we have just the opposite. And we have the benefit of having this ad, a similar ad being run by the State Department for three weeks, without this violence and so forth. Again, to understand the scope of the principle you're advancing, let me change the hypothetical to give you a non-inflammatory one, I hope, but one that could still offend a number of people. Let's say that bicycle manufacturers or a group supporting the use of bicycles wanted banner ads put on the bus that said all right-thinking people should ride bicycles to downtown and not drive cars in the downtown city or in the suburbs. They should be big people. Now, if the Metro bus thought that such an ad would offend their typical ridership, would they still have to put it up? Yes, that's a viewpoint discrimination. Viewpoint, and again, this is the Supreme Court's precedent on this. We live in a disputatious, you know, society. There's no question about it. The First Amendment is there, though, to protect speech that is offending. If it's only speech that everybody's comfortable with, there's no reason to have a First Amendment. Counsel, would it be permissible for the county to decide that in view of these developments legally and socially, that it would not accept any political ads of any kind, but only, say, commercial ads that are truthful or non-profit organizations and their events or something like that? Would that be permissible? I think under the current scope of the law, where the courts have upheld, where they make categorical exclusions for any political type speech and just limit it to commercial advertising, paid commercial advertising, the courts have upheld that. I think there's problems with that personally, but my personal opinions haven't been carrying the weight all the time in these courts. So basically, under the current jurisprudence dealing with these advertising cases, and I've done many of them all across the country, that the the courts have gone that direction, that if you shut it off to pure political, these controversial ads and you keep it just a commercial advertising for the purpose of revenue generating, they've allowed the transit authorities to do that. I'd like to reserve the balance of my money for rebuttal. You may. Thank you. Well, may it please the court, David Hackett, senior deputy prosecutor representing King County in this matter. This important case is about the ability of municipalities to preserve properties for their intended use while allowing limited speech activities. AFDI essentially claims a First Amendment right to demean and disparage customers on Metro buses. Well, after Mattel, whether we agree with it or not, why isn't that true? Why isn't offending people a viewpoint, according to the Supreme Court? Well, you certainly have that statement in the lead appeal. Well, it's more than a statement. They struck down a standard of disparagement and demeaning of others as illegitimate. We do not believe Mattel applies in this case, much like the DC Circuit case. I would say for several reasons. First, it's not a public forum case or not a non-public forum case. In both this court and the Supreme Court have cautioned against extending cases that do not arise in a non-public forum to non-public forum issues. Well, but how are you aware of any cases that say that the concept of viewpoint neutrality changes complexion depending on the forum? Other things change, but does identifying something as either being viewpoint neutral or not, are there cases that say that that concept is different depending on the forum? Yes, I do believe so. And I would rely on CMAQ and I would rely on Cornelius. And the part that I would rely on, and I think CMAQ's actually quoting Cornelius, and this is carried through in every non-public forum from the US Supreme Court, most that the government can restrict access to a non-public forum as long as restrictions are reasonable, we know that, and are not an effort to suppress expression merely because public officials oppose the speaker's view. Now that shorthanded is viewpoint discrimination, but it is a very particular type of viewpoint discrimination where there is evidence that the government is looking to express suppression merely because of is completely missing in this case. The record matters. Well, it does matter, and in that regard, what is your response to counsel's argument that there is no evidence of reasonably foreseeable disruption under the disruption prong, assuming that we get past the disparagement prong? Well, there is evidence, and it's actually undisputed evidence. But it's so the importance of a business maintaining its reputation, and also explains from General Manager Gannon, that we want to retain customers. Right, but that's all supposition as far as I could tell. There's no evidence of a drop in ridership or significant complaints when the similar ad ran, and so why isn't there a failure of proof on disruption? Well, being a have to wait till the horses have escaped the barn before you close the door. Anybody running a business... I'm not sure that's a First Amendment. It's due in court. Well, I would say under non-public forum doctrine, the choices made by government officials need to be reasonable, right? Not the most reasonable, and why that's important is because running a business, just like any individual, they don't have to say, well, let's try this and see if our customers really hate it. And if they do, and if they stop riding our buses, we'll know we were wrong. In a government context, when we're talking about the First Amendment, I'm not aware of any case that says, well, just being really seriously and genuinely worried about disruption, and in good faith, is enough, without evidence that there is a likelihood of it occurring. Are you aware of any case that says that's good enough? I would say that I'm not aware of any case that says you need more than that. Now, certainly there is CMAQ, where the ad went on the bus for a long period of time. There were six or seven thousand complaints about disruption, and the ad was pulled. Does it have to get that bad before you do it? I'd point the court to Cogswell, where the city of Seattle had a prohibition in its voters pamphlet that you could not criticize your opponent. Now, that is far worse than anything AFDI complains of in this case. As the court noted in Cogswell, from this circuit, essentially that was an anti-mud-slinging provision. In a purely political realm, you could not sling mud against your opponent, and the court held that that was acceptable because it was a non-public forum. Non-public forums are truly driven by this idea from Arkansas television that you want more speech, not less speech, and I think we're very clear in our brief and very open in the That's maybe the answer. That's why I asked the question I did. It may be that only commercial advertising that pays its way will be permitted, and that may be the result, but the desire to go beyond that doesn't drive the analysis. It's the other way around. Well, I would disagree with that respectfully, Your Honor. I think that the Arkansas television case does set out that standard that when we're talking about this special beast of non-public forums, we're not talking about what you can do on the sidewalk. We're not talking about billboards. We're not talking about what you can do in newspapers. We're talking about a government-owned piece of property. The government is allowed a higher level of regulation, and that is something that is absent from Mattel. So, when you tell somebody that they can't name their band The Slants, it doesn't look at the countervailing question of what interest does the government have in controlling its property for the reasonable purposes that that property is put forward, and that is why Arkansas television has that special rule. That's not the disparagement standard. That's maybe the disruption standard, because certainly if you have, as I posited earlier with opposing counsel, if you have a situation in which the ridership has dropped or people are too upset to ride the bus in large numbers, then the property isn't being used for its intended purpose. But it's hard to see how just putting something offensive on the side of the bus where it doesn't affect those things, ridership, revenue, the level of complaints that you have to deal with, it's hard to see how that affects your operations. Would your client accept a banner ad on the King County bus that said, Mexico is sending rapists. Re-elect Donald Trump. I think that Mexico is sending rapists would be a factual question, and we would ask for factual support for that assertion, and that is probably how that one would go. As far as re-elect Donald Trump, we do not allow political ads on our bus that advocate for a specific client. That is an accepted category within our transit advertising policy. I think I am understanding your question a little bit better. We did not exclude the AFDI ad for disruption, but for interference with the transit system. So disruption was the prong that we relied upon for CMAQ. In this case, we relied upon interference. And I think... What's the difference between interference and disruption? In disruption, I think interference is a slightly lower standard. It's disruption or interference. And I think we are just going for the simple proposition that business judgment has to be exercised by people that are charged with operating a multi-million dollar transit agency. So interference basically sounds like ideas we don't like from your description of it, because if there's no evidence of actual interference, whether you call it disruption or interference, if you're able to send your buses out and you only get two or three calls to complain, and you're still getting the same amount of revenue as far as the record shows, where's the interference? The standard under the TAP, I believe, is whether a reasonable, prudent person applying community standards would believe that it would interfere with Metro. So granted, there is no evidence of interference in the sense of a single rider being denied because of that ad in this case. Rather, what General Manager Gannon is exercising is his business judgment that he thinks this is incompatible with the overall Metro purpose of increasing ridership. Counsel, let me ask you a question, if I may, about that issue about the judgment of Metro. Is it feasible that Metro could put signs up on their buses saying that if any ads that were running offend you or you think will interfere with your use of our bus system, let the county know with one of the cards we've got here. Could they do something like that? Would it be practical so that you could let people like AFTI run the ads they want to run that have political content, but have some feedback as to whether you are going to lose a segment of your ridership? I suppose they could do that, but the standard would be, of course, this community standard, applying the reasonable, prudent person. And so I think in that situation, and I'd like to focus on demeaning and disparaging, because I think that's truly the nut of this case. I mean, the reason it interferes with is because it's demeaning and disparaging. In that type of viewpoint discrimination, if you take AFTI's position to its logical conclusion, there is nothing that Metro could keep off its buses, even when necessary, to preserve the basic function of the bus system. Well, there is, because you could either eliminate things that are actually interfering, or you could eliminate all political advertising, and those things would work out. And it isn't, it doesn't seem equivalent to me, to go back to Judge Gould's example, if an ad said everybody should ride bikes and not use these buses because it's bad for the environment, in our opinion, it's not demeaning to any person, really, or group, but it might interfere. So I don't see why they're coterminous. I don't believe that that would be an ad that we would exclude under either category, the Even if your ridership dropped precipitously? I think applying contemporary community standards, we do allow political statements on the bus. And I don't think the answer is, well, you either drop them all together, or you have no ability to regulate those ads. And I think a holding from this panel along those lines would violate Cogswell. In Cogswell, the holding is very clearly, in a highly political realm, you can tell candidates what they can and can't say. And that's because of the non-public forum rule. That decision is binding. It's also consistent with the Supreme Court. But it's also really quite distinguishable, because the basis of that is, if you put in something about yourself, it should be about yourself, and not about someone else. That's really not this situation at all. Well, I think in this case, it's important that Ms. in the record acknowledge that her viewpoint could be put forward in any of a million ways. She insisted on the one way that violated our TAP. And maybe out of a million, there's, you know, 999 that violate our TAP. But the point is, there are ways to do it that don't violate the TAP. And with the First Amendment, and the Arkansas television case required those situations, is that AFDI compromised to the extent of making that easy fix to the ad, so that it meets the Otherwise, the forum closes. And we have no speech at all. That is a choice that the Supreme Court has noted is abhorrent to the First Amendment. Limiting speech for the principle of not allowing the government to impose reasonable restrictions. And I think it's hard to argue in this case. And indeed, the record would not support, because General Manager Gannon's declaration and undisputed on this record, that it is reasonable for Metro to adopt the demeaning and disparaging type provision that it has, and other provisions that it has in its TAP, because that preserves the business purposes of the bus system. It puts passengers in the seats. It keeps them coming back. There is nothing unreasonable about it. Certainly, if McDonald's didn't, we wouldn't be criticizing them. If any other business did it, why criticize Metro? And I think that's what Arkansas television in those cases stand for, is that in that situation where the government is exercising a proprietary function, it gets to operate somewhat under the same rules. And that, of course, is limited by reasonableness. And it's limited by this idea of viewpoint discrimination under Cornelius, under Cogswell, under CMAQ, under this court's opinion in AFDI. And that's that question of, are we suppressing expression merely because we oppose the speaker's view? In this case, no one is allowed to use demeaning and disparaging content on our buses. No one is allowed to use profanity. No one is allowed to use nudity to communicate their message. Those are essentially, as the First Circuit put it, the ground rules that allow us to operate a bus where people enjoy riding it every morning. And while we do applaud our bus drivers in Seattle, we have a whole heck of a lot more bus riders right now. And we, I guess, we, our contemporary community standards wouldn't see those two at odds. Thank you, counsel. Thank you. I'm going to pick up where opposing counsel left off about the point about why, you know, why is Metro different? Metro is different because of the government. They're different from McDonald's. They're different from any other, you know, private business because they are the government and the First Amendment is a restriction on the government's ability to restrict speech. It's a break on that. And reasonableness, even in a non-public forum, isn't the only component. The other component, which is the main one issue here, is viewpoint neutrality. And as I started out at the beginning, viewpoint discrimination is viewpoint discrimination. Mattel v. Stamp, if you look at that Wondering Dago's case in the Second Circuit, there the Wondering Dago's were arguing it was a government, I was arguing it was a non-public forum, and the Second Circuit appropriately said it doesn't matter because the government is engaging in viewpoint discrimination, which it cannot do. If they want to be in the advertising business and they want to open up their, this forum to political speech, then they have to accept the limitations of the First Amendment. And those limitations are not just reasonableness, but viewpoint discrimination. And regarding, you know, he cites the Cornelius and the others. If you look at Tam, when the viewpoint discrimination is, it used the term, it said, our cases, and it was referring to cases dealing with, in a public forum cases. Rosenberger, Lamb's Chapel, the Good News case, those are cases that we've all cited. In viewpoint discrimination, in Mattel v. Tam, it went further in terms of specifying the given offense as a viewpoint. But viewpoint discrimination, as I said, is viewpoint discrimination under Cornelius, Rosenberger, and Lamb's Chapel. If you subject matter to be discussed, you can't pick and choose which viewpoint on that subject matter you're going to permit and which one you're not going to permit. Viewpoint discrimination under Mattel v. Tam is the same viewpoint discrimination under Rosenberger, same viewpoint discrimination under Lamb's Chapel. And as the Supreme Court made clear in Mattel v. Tam, makes the same point in Rosenberger, just because you're applying it even-handedly. And they use, in the example, you can, you, whether you're disparaging Republicans or disparaging Democrats, or disparaging Socialists, or disparaging Capitalists. The fact that it's being applied even-handedly does not diminish the fact that it is, at the end of the day, viewpoint discrimination. And that's what should control this case. And both the disruption component and the disparaging component, they're interrelated because they all come down to the fact that they oppose the viewpoint of my client and they think others might oppose that viewpoint. There is no evidence of the things that this court said was important in CMAQ of reduced ridership, substantial diversion of resources. You've exceeded your time. We appreciate the arguments from both counsel. They've been very helpful. And the case just argued is submitted. We will stand adjourned. Thank you.
judges: Hawkins, Graber, Gould